UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAMELA LESLIE, REBEKAH LEE
KEELEY, PAMELA JEAN BLAKE,
ELIZABETH ANN KAPUS & JASON
LEWANDOWSKI

      Plaintiffs,

v.

MICHIGAN BELL TELEPHONE
COMPANY d/b/a AT&T,

      Defendant.

Case No. 15-11205

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [30]**

    This matter comes before the Court on Defendant's motion for summary judgment. Plaintiffs allege Defendant unlawfully retaliated against them in violation of the Family and Medical Leave Act (FMLA) and the Michigan Persons with Disabilities Civil Rights Act (PWDCRA). Plaintiff Pamela Leslie also alleges age discrimination in violation of the Michigan Elliott Larson Civil Rights Act. For the reasons stated herein, the Court DENIES Defendant's motion as to Plaintiffs' FMLA and PWDCRA claims and GRANTS Defendant's motion as to Plaintiff Pamela Leslie's age discrimination claim.[1]

**I.   Background**

    Each Plaintiff was previously employed as a service representative in Defendant's Port Huron call center location. The service representative position is an hourly, non-

---

[1] Plaintiff concurs her age discrimination claim should be dropped. (Dkt. 32-1, at 46) Accordingly, Defendant's motion for judgment on Count III is granted.

management position. The primary responsibilities are: handling incoming customer calls regarding disconnecting or cancelling service, attempting to retain business, resolving customers' problems, and when possible, attempting to sell additional products or services. (*See, e.g.*, Dkt. 32-24, Kapus Dep. at 7.) Service representatives report to first-level coach managers, who in turn report to a Center Sales Manager (CSM). (Dkt. 30, at 12.) The CSM reports to a General Manager (GM), who oversees multiple call centers. (*Id.*)

Each Plaintiff took FMLA or disability leave at some point during their tenure. Pamela Leslie took four months after suffering a mental breakdown on the job. (Dkt. 33-2, Leslie Dep. at 19-21.) Rebecca Lee Keeley took leave at various times for stress and irritable bowel syndrome. (Dkt. 33-14, Keeley Dep. at 26-32.) Pamela Jean Blake used leave intermittently for migraine headaches (Dkt. 33-4, Blake Dep. at 42), as well as for a longer period of time due gynecological surgeries. (*Id.* at 16.) Elizabeth Ann Kapus took intermittent leave for various conditions, including migraines. (Dkt. 33-24, at 7-8.) And Jason Lewandowski took intermittent leave due to sleep apnea, upper respiratory infections, and post-traumatic stress disorder. (Dkt. 33-6, Lewandowski Dep. at 31-32.)

Ultimately, each Plaintiff resigned from Defendant. Plaintiffs claim they were targeted because they had disabilities and took FMLA leave. As a result of the allegedly intolerable working conditions, Plaintiffs claim they had no choice but to resign. This suit followed.

**II. Summary Judgment**

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the record, "the court must view the evidence in the light most favorable to the

non-moving party and draw all reasonable inferences in its favor." *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (internal citation omitted). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. Analysis

### A. FMLA and PWDCRA

Plaintiffs allege Defendant unlawfully retaliated against them in violation of the FMLA and PWDCRA.[2] (Dkt. 12, at ¶¶130-31, 135.) To establish a prima facie case of retaliation under both statutes, a plaintiff must show (1) she was engaged in protected activity; (2) the employer knew of this exercise of the plaintiff's protected rights; (3) the employer subsequently took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Festerman v. Cty. of Wayne*, 611 F. App'x 310, 319 (6th Cir. 2015) (FMLA); *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015) (PWDCRA).

Defendant argues each Plaintiff voluntarily resigned and thus summary judgment must be granted in its favor because Plaintiffs cannot establish an adverse employment action taken against them. (Dkt. 30, at 42.) The Court disagrees.

#### 1. Constructive Discharge

Plaintiffs allege Defendant took an employment action adverse to them by constructively discharging them. Constructive discharge can constitute an adverse

---

[2]For purposes of this motion, Defendant does not seek summary judgment on the basis of whether Plaintiffs are disabled as defined under the PWDCRA. (Dkt. 30, at 41.)

3

employment action. *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005). To demonstrate constructive discharge, a plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person and (2) the employer did so with the intention of forcing the employee to quit. *Id*.

### a. Intolerable Working Conditions

Working conditions are "objectively intolerable" when "a reasonable person in the plaintiff's shoes would feel compelled to resign." *Festerman*, 611 F. App'x at 320 (internal quotation marks omitted). The Sixth Circuit considers several factors when determining whether a reasonable person would feel compelled to resign, including: demotion; reduction in salary; reduction in job responsibilities; reassignment to menial or degrading work; reassignment to work under a supervisor; badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or offers of early retirement or continued employment on terms less favorable than the employee's former status. *Id*. This list, however, is not exhaustive; and while hurt feelings and public criticism alone are insufficient, the Court may consider any facts it deems relevant. *See id*.

Here, there is significant evidence of difficult working conditions that existed for all Plaintiffs. First, each Plaintiff testified that he or she was told or otherwise made aware that there was a policy to target FMLA users so as to try to move them out of the business. (*See, e.g.*, Dkt. 33-2, at 40; Dkt. 33-14, at 48; Dkt. 33-4, at 39-40; Dkt. 33-24, at 40-41; Dkt. 33-6, at 69.) Several managers similarly testified that they were instructed by upper management to target FMLA and disability users for termination and discipline. *See Brister v. Mich. Bell Tel. Co.*, No. 14-cv-11950, 2016 WL 74870, at *1, 8 (E.D. Mich. Jan. 7, 2016) (discussing many of the same depositions).

For example, Sean Brister,[3] a CSM from 2002-2013, testified that she was told by the GM that she did not "move fast enough or target employees that used FMLA." (Dkt. 33-9, Brister Dep. at 22.) Brister explained that the GM, Geoffrey Lee, instructed her to discipline only those sales representatives who used FMLA when conducting performance reviews. (*Id.* at 24.) When asked if she could recall specific meetings in which she was given the direction to target employees who used disability or FMLA leave, Brister testified "it was too numerous for me to recount every one." (*Id.* at 47.) As the CSM in the Port Huron location from 2002-2013, between eight and fourteen first-level coach managers reported to Brister at a time. (*Id.* at 8.) Many of these coach managers were Plaintiffs' direct supervisors.

Joseph Gouin, a first-level coach for at least four of the five Plaintiffs, testified that he targeted FMLA users after being instructed to do so by management. (Dkt. 33-20, Gouin Dep. at 5-8, 18-21.) He stated he was instructed to move consistent users of FMLA time "out of the business" and that he would receive a report with a list of employees' names to target. (*Id.* at 5.) He targeted FMLA users by "searching for things that the employee did incorrectly and finding ways to take corrective action." (*Id.* at 7.)

Tracy Domozik[4] a first-level coach for at least three Plaintiffs, testified that due to attendance problems, "we wanted to start looking at who we rewarded when it came to FMLA, those who used FMLA and those who didn't use FMLA." (Dkt. 32-19, Domozik Dep. at 8.) When winners were announced for an office contest, Domozik sent an email to select

---

[3] Ms. Brister's new last name is Dupree (Dkt. 32-10, at 3); the Court refers to her by her former last name.

[4] Ms. Domozik's new last name is Turner (Dkt. 32-19, at 3); the Court refers to her by her former last name.

coaches, stating, "These 3 winner's [sic] all abuse FMLA----maybe we should verify that 1st??????" (Dkt. 33-22.) Domozik explained that she sent the email because she had been directed by Lee "that we don't want to reward those who are not coming to work." (Dkt. 32-19, at 10.) And while the email referred only to FMLA abusers, she testified that she and her supervisors often discussed both FMLA abusers and more generally, FMLA users. (*Id.* at 9.) Each Plaintiff received or knew about this email. (Dkt. 33-22; Dkt. 33-6, at 61; Dkt. 33-4, at 24.)

On November 11, 2011, an individual in Defendant's operations department sent an email to several GMs (including Port Huron's GM) stating, "Come to Work is our #1 priority ... . Do not EVER let me walk into one of your centers and NOT see ... daily callouts, [an attendance ranking] report in PLAIN sight and updated monthly ... ." (Dkt. 33-46.) The email continued, "I want an explanation for each of the problem children. Is it a legitimate issue (cancer, etc.). If not, what are you going to do to move this person OUT OF THE BUSINESS before FMLA starts back over on January 1?" (*Id.*)

The "daily callouts" referenced above were signs that were posted in the office every day with the number of people who had called in or were otherwise absent; this number purportedly included employees who were out on FMLA and disability leave, but not those on vacation. (*See, e.g.*, Dkt. 33-4, at 25.) Plaintiffs further testified that management would have meetings instructing employees to "get your peers to work" and to "put the pressure on them or the center will close." (*Id.*) These actions, Plaintiffs contend, "contributed to a hostile atmosphere and were intended to pit workers against fellow employees who were using legally-approved FMLA leave." (Dkt. 12, at ¶ 61.) Additional facts specific to each Plaintiff are set forth in the analyses, below.

### i. Pamela Leslie

In 2009, Leslie states she was told by supervisors to encourage her fellow employees to come to work. (Dkt. 33-2, at 13.) When she asked whether her own job was at risk, she was told, "as long as you come to work, you shouldn't have to worry." (*Id.*) After this meeting, Leslie sent out an office-wide email stating that employees who were "abusing the use of FMLA ... should exit the business." (*Id.*)

In 2011, Leslie took her own FMLA leave after suffering a mental breakdown on the job. (*Id.* at 19.) Leslie alleges she was targeted and harassed for taking FMLA leave in a number of ways. First, the day she returned from leave she received a final written warning for violating Defendant's attendance policy, with no advance notice that she had exhausted her FMLA leave,[5] nor a verbal or first written warning.(*Id.* at 30-32.) Leslie testified she felt distraught, targeted, and very nervous upon receiving the warning on her first day back from a disability stress leave because if she was "a minute late" she could now face termination. (*Id.* at 32-33.)

Leslie also alleges she was targeted by her supervisor, Connie Hayes. She claims Hayes reviewed her performance for not meeting her adherence target for one day, which Leslie claims was unusual. (*Id.* at 21.) Leslie's co-worker testified that she witnessed Hayes's harassment of FMLA users including Leslie. (Dkt. 33-23, at 28.) In addition, Leslie alleges she was targeted by not getting proper training on policy changes, promotions, and new processes, which led to her making mistakes on calls with customers. (Dkt. 33-2, at 42-44.) In January 2012, Leslie received a low "scorecard" (a monthly review tool used by

---

[5]Plaintiff also alleges the failure to provide at least five days notice violates employer notice requirements under 29 C.F.R. § 800.300(d)(5). (Dkt. 32-1, at 43.)

Defendant) for the month of November, which she claims may not have been adjusted for partial days worked. (*Id.* at 21.) Six days later, Leslie went back on leave for stress. (*Id.* at 34.) Plaintiff resigned in March 2012. (*Id.* at 24.)

Viewing the facts in the light most favorable to Leslie, there is at least a genuine issue of fact as to whether Leslie experienced intolerable working conditions. Two of Leslie's managers, Domozik and Gouin, testified that a policy to target FMLA users existed; prior to taking her own leave, Leslie was encouraged by management to tell her co-workers to come to work and was told her own job would not be at risk as long as she came to work; and after taking her own FMLA leave, she received a final written warning for unexcused absences on her first day back. Moreover, she claims she did not receive training and was monitored more closely by supervisors because of her FMLA use. Although Leslie does not allege that she was demoted, that her salary or job responsibilities were reduced, or that she was reassigned to do menial or degrading work, she has alleged that she was targeted and harassed by her managers in a way that was calculated to encourage her resignation. A reasonable jury could conclude that conditions were so intolerable that someone in Leslie's shoes would feel compelled to resign.

### ii. Rebekah Lee Keeley

Keeley claims she was targeted in a number of ways. First, she claims her manager, Joseph Gouin, targeted her for taking FMLA time. (Dkt. 33-14, at 44.) Gouin does not dispute this. In fact, he admits that the GM would show the coaches "who FMLA users were. And ... those were the representatives who were targeted." (Dkt. 33-20, at 5.) With specific regard to Keeley, Gouin stated, "it seem[ed] like there was extra focus through the

8

years with [Keeley]" and his manager asked him to put "additional coaching ... on [Keeley]." (*Id.* at 19-20.)

In addition, Keeley was at a meeting at which manager Pearlanne Pollard allegedly announced an "asses in the seats" policy targeting FMLA users. According to Keeley, Pollard said, "Your mother-in-law could have a stroke and ... you still need to come to work. Your butt still needs to be in your seat. Your husband could have a heart attack. You still need to be at work." (Dkt. 33-14, at 44-45.) Keeley claims Pollard would "hover" around her desk or wait for her during sign-in or shift changes. (*Id.* at 52.) Keeley also testified regarding several times when she was disciplined for tardiness. On more than one occasion, Keeley claims she was disciplined for being only a few minutes late. (*Id.* at 53-54, 70-71.) According to Keeley, management refused to disallow the tardies and wouldn't allow her to use "flex time" (flexible scheduling options). (*Id.*)

Shortly before her resignation, Keeley states she returned from leave and found her belongings in a corner. (*Id.* at 38.) She states that her new manager, Tosha Hall, treated her in a "hostile" and "demeaning fashion." (*Id.* at 39, 49.) On one occasion, Hall allegedly pulled Keeley's attention away from a customer call and told her, "Oh I'm going to spend a lot of time with you little girl." (*Id.* at 49-50.) A co-worker submitted a declaration swearing that she observed this continuous harassment, noting that she saw Hall at Keeley's desk three times more than anyone else's. (Dkt. 33-23, at 17.) Keeley stated in her resignation letter, "This is no longer a healthy work environment for me ... I am very excited to start my new journey and walk out of my golden handcuffs." (Dkt. 33-38.)

There is ample testimony and evidence suggesting Keeley was subjected to targeting and harassment; her manager even admitted that "there was an extra focus" on Keeley

with regard to coaching and observation. The Court cannot conclude no reasonable jury would find Keeley's working conditions rose to the level of being objectively intolerable.

### iii. Pamela Jean Blake

Blake served as a "service leader" at various times throughout her employment. This position required covering the floor, helping other employees, getting assistance from managers, and taking over phone calls with irate customers. (Dkt. 33-4, at 11.) According to Blake, being a service leader came with additional benefits, including extra pay and time off the line. (*Id.* at 11.) In 2010 or 2011, however, Blake lost the position and claims she was told by management that FMLA users were no longer eligible. (*Id.* at 11-12.)

Blake's manager, Joseph Gouin, admits he believes he targeted Blake because she took FMLA and disability time. (Dkt. 33-20, at 18.) He "kn[e]w she exhausted all her FMLA time" and "had a job accommodation" and he was "listening for extra things" when he was coaching and observing Blake's performance. (*Id.* at 17-19.) This additional focus, Gouin believed, led to lower results on Blake's scorecard reviews. (*Id.* at 18.) Blake felt targeted in other ways, as well; for example, she testified that people who did not use FMLA leave "could sign out extra to go to the bathroom or they could take a little more relaxed time off in order to catch up" with work, while Blake could not. (Dkt. 33-4, at 39.)

Based on these facts, a reasonable jury could conclude that Blake experienced intolerable working conditions. First, she allegedly lost her position as service leader because she used FMLA. This fact alone would likely be sufficient to survive summary judgment. *See Festerman*, 611 F. App'x at 321 (reversing grant of summary judgment to employer where the plaintiff alleged modification of his job requirements so that he could no longer fulfill the new requirements). But here, Blake has also put forth significant

evidence of harassment, including the testimony of her manager admitting that he believes he targeted Blake for additional performance reviews and discipline because she used FMLA and disability leave. The evidence is sufficient to create a genuine issue of fact as to whether Blake suffered intolerable working conditions.

### iv. Elizabeth Ann Kapus

Kapus claims she was harassed and targeted by her supervisors in a number of ways. Tosha Hall, one of Kapus's managers, allegedly targeted Kapus by: placing her desk in the front so Hall could hear all her calls; making "derogatory verbal statements" to her, such as "you suck;" and calling Kapus up to her desk to reprimand her nearly every other day. (Dkt. 33-24, at 45-47.) Joseph Gouin was another one of Kapus's managers. (Dkt. 33-20, at 17.) Although Gouin couldn't recall whether he targeted Kapus specifically, as noted above he has admitted he targeted FMLA users. (*Id.*)

Kapus also testified that a supervisor told her that her job could be in jeopardy due to her absences. (Dkt. 33-24, at 32.) She received several written warnings and was put on coach action plans. Kapus further claims she was denied flex time on many occasions and also denied sufficient training to become familiar with new systems and products after returning from leave. (*Id.* at 14-15, 19, 41-42.) In addition, she states she experienced "questioning from co-workers" about her absences; after undergoing knee surgery, for example, one co-worker asked Kapus if she had "Dr. Summeroff." (Dkt. 33-24, at 49.)

In January 2014, Kapus considered resigning because she felt "defeated." (*Id.* at 37-38.) After meeting with a financial planner, however, she decided to stay. (*Id.*) In October 2014, Kapus had a panic attack on her way to work. (*Id.* at 48.) According to Kapus, her doctor told her she needed to find a "new gig." (*Id.*) Kapus met with a

second financial planner and determined she could resign from a financial perspective. (*Id.* at 38.)

Viewing the evidence in the light most favorable to Kapus, there is a genuine issue of fact as to whether Kapus experienced objectively intolerable work conditions. On the one hand, Kapus considered quitting at least eight months prior to doing so but chose not to until meeting with a second financial advisor and determining she could resign from a financial perspective. In addition, Kapus does not allege any demotion, loss of salary, or work responsibilities. On the other hand, however, there is evidence suggesting Kapus was harassed in a way calculated to encourage her resignation. Kapus's manager has admitted he was told to and did target FMLA users to try to "move them out" of the business and, according to Kapus, other supervisors told her "you suck" and that her job could be in jeopardy due to her absences. Kapus has presented sufficient evidence, when viewed in her favor, to support a finding that intolerable work conditions existed.

### v. Jason Lewandowski

Lewandowski testified that managers would frequently discuss FMLA leave with him. (*See, e.g.*, Dkt. 33-6, at 52-55.) Several senior managers, including Sean Brister and Jeremy Lewandowski (his brother), specifically told him that flex time would not be offered to FMLA users. (*Id.* at 55.) Moreover, Lewandowski states that Brister told him about a "list" that the managers received, which included names of people who used FMLA. (Dkt. 32-7, at 55-56.) As a union representative, Lewandowski also states that he observed management refuse to settle certain employees' grievances if the employee was someone who "takes too much FMLA time." (*Id.* at 52.)

Lewandowski also states his experience working under supervisor Lawunda Jackson was "living your entire day where she's going to harass you about every little aspect of every little thing." (*Id.* at 50). According to Lewandowski, she told him he was taking too much FMLA time and hurting the team. (*Id.*) After Lewandowski received a suspension for unsatisfactory attendance, he testified that he believed he was "on the verge of termination" because once an employee reached "suspension level" for attendance violations, "[y]ou could end up with a flat tire and lose your job as a result." (*Id.* at 20.)

In early 2015, Lewandowski claims his new supervisor, Jessica Curtiss, told him that the company wanted to "drive out people who used FMLA." (*Id.* at 69.) He later discovered that Curtiss was "pulling more calls than should be pulled" for his review. (*Id.* at 42.) According to Lewandowski, prior to taking FMLA leave, only two calls would be pulled for evaluation; but when he returned from FMLA leave, six evaluative calls were pulled for review. (*Id.*) Shortly thereafter, he decided to resign. (*Id.* at 42-44.)

While Lewandowski does not allege demotion, reassignment, or a reduction in his salary, the evidence of harassment is significant. Viewing the facts in the light most favorable to Lewandowski, the Court concludes there is a genuine issue of fact as to whether he was subjected to intolerable working conditions.

### b. Intent

With regard to the intent requirement, "intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions." *Festerman*, 611 F. App'x at 321-22 (internal quotation marks omitted). Based on the facts alleged and supported by the record, intent can be reasonably inferred here. Many of Plaintiffs'

supervisors testified that a policy or directive to target FMLA users for discipline or discharge existed. The goal and purpose of the targeting, according to their testimony, was to move FMLA users out of the business. In addition, Plaintiffs were told their jobs were at risk because they were using too much FMLA and were discouraged on a regular basis from taking protected leave by their superiors and peers. There are ample examples in the record of harassment of Plaintiffs seemingly designed to encourage their resignation. The Court concludes there is at least a genuine issue of fact as to whether Defendant deliberately created intolerable working conditions for Plaintiffs with the intent to force their resignation.

Based on the above evidence, Plaintiffs have put forth sufficient evidence to establish an adverse employment action, as well as a prima facie case of unlawful retaliation. As such, Plaintiffs' FMLA and PWDCRA claims will survive Defendant's motion for summary judgment.

### B. Lost Wages and Benefits

Finally, Defendant seeks summary judgment on four Plaintiffs' claims for lost wages and benefits. Specifically, Defendant argues Leslie, Blake, Lewandowski, and Kapus have not engaged in reasonable efforts to mitigate their damages by searching for comparable employment, and thus are ineligible for such damages. (Dkt. 30, at 47-48.)

As Defendant notes, a plaintiff must use reasonable diligence to find substantially equivalent employment. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982). Defendant, however, has the burden to show failure to mitigate damages. *Taylor v. Invacare Corp.*, 64 F. App'x 516, 523 (6th Cir. 2003). Indeed, "[t]he defendant must show that

substantially equivalent positions were available and the plaintiff failed to use reasonable diligence in seeking them out." *Id.*

Here, Defendant has put forth no evidence regarding the availability of substantially equivalent positions. And "in general, the obligation to mitigate is largely an inquiry into reasonableness which is properly within the province of the jury." *Wolfe v. Vill. of Brice, Ohio*, 997 F. Supp. 939, 945 (S.D. Ohio 1998). Accordingly, the Court cannot conclude that as a matter of law that Plaintiffs' right to lost pay has been vitiated by any failure to mitigate.

## IV. Conclusion

For the above-stated reasons, the Court DENIES Defendant's motion for summary judgment as to Plaintiffs' FMLA, PWDCRA, and lost wages claims. The Court GRANTS Defendant's motion for summary judgement as to Plaintiff Pamela Leslie's age discrimination claim, and as such, Count III of the amended complaint is hereby DISMISSED.

SO ORDERED.

        S/Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated: August 9, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 9, 2016, by electronic and/or ordinary mail.

        S/Carol J. Bethel
        Case Manager